## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KAREN HARPER,            :
                                 :
             Plaintiff          :      No. 3:15-CV-2318
                                 :
          vs.                  :      (Judge Nealon)
                                 :
NANCY A. BERRYHILL,[1] Acting    :
Commissioner of Social Security,    :
                                 :
            Defendant       :

## MEMORANDUM

On December 2, 2015, Plaintiff, Karen Harper, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017, and thus replaces Carolyn W. Colvin as the Defendant.  <u>See</u> <u>http://blog.ssa.gov/meet-our-new-acting-commissioner/</u>.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

1461, et seq. and her application for supplemental security income ("SSI")[3] under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] her applications for DIB and SSI on November 7, 2012, and November 8, 2012, respectively, alleging disability beginning on October 12, 2012, due to a combination of "fibromyalgia, asthma, high blood pressure, and migraines." (Tr. 18, 168).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on December 21, 2012. (Tr. 18). On March 8, 2013, Plaintiff filed a request for an oral hearing. (Tr. 18). On

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. __)" are to pages of the administrative record filed by Defendant as part of the Answer on March 9, 2016. (Doc. 10).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

February 4, 2014, an oral hearing was conducted by administrative law judge Susan L. Torres, ("ALJ"), at which Plaintiff and impartial vocational expert Michele C. Giorgio, ("VE"), testified. (Tr. 18). On March 13, 2014, the ALJ issued a decision again denying Plaintiff's applications for SSI and DIB. (Tr. 18-29). On May 8, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 9). On November 13, 2015, the Appeals Council denied Plaintiff's appeal, thus making the decision of the ALJ final. (Tr. 1-3).

Plaintiff filed the instant complaint on December 2, 2015. (Doc. 1). On March 9, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on April 21, 2016. (Doc. 12). Defendant filed a brief in opposition on May 16, 2016. (Doc. 13). Plaintiff filed a reply brief on May 31, 2016. (Tr. 14).

Plaintiff was born in the United States on December 7, 1962, and at all times relevant to this matter was considered an "individual closely approaching advanced age."[7] (Tr. 164). Plaintiff graduated from high school in 1980, and can communicate in English. (Tr. 167, 169). Her employment records indicate that

---

7. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

3

she previously worked in a sewing factory as a cutting room supervisor and quality control supervisor and at a non-profit organization as a warehouse supervisor. (Tr. 170).

In a document entitled "Function Report - Adult" filed with the SSA on November 26, 2012, Plaintiff indicated that she lived in a house with her family. (Tr. 181). When asked how her illnesses, injuries, or conditions limited her ability to work, she stated that she was in constant pain regardless of whether she was sitting or standing, that she could not stay in one (1) position for any extended period of time, and that the numbness in her hands limited her ability to use them. (Tr. 181). From the time she woke up to the time she went to bed, Plaintiff would "shower, clean, get on computer." (Tr. 181). She was able to slowly take care of personal care tasks such as dressing and bathing, shopped for groceries two (2) to three (3) times a week for one (1) to two (2) hours at a time, performed housework, and prepared meals, but indicated it took her "a lot longer" to do these activities because of pain. (Tr. 182-183, 191). She indicated she had to walk very slowly and had to rest for five (5) minutes before resuming walking. (Tr. 185). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, or getting along with others.

(Tr. 185).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal need or to go places, but did need special reminders to take her medicine. (Tr. 184, 191). She could pay bills, use a checkbook, count change, and handle a savings account. (Tr. 183). She could pay attention for "a long time," followed written and spoken instructions well, was able to finish what she started, and handled stress and changes in routine well. (Tr. 185-186).

Socially, Plaintiff went outside two (2) to three (3) times daily. (Tr. 183). She indicated that she was able to travel alone by walking, driving a car, and riding in a car. (Tr. 183). She did not go anywhere on a daily basis. (Tr. 184). Her hobbies included using the computer and "games." (Tr. 184). She spent time with her grandchildren a few times a week. (Tr. 184).

Plaintiff also completed Supplemental Functional Questionnaires for fatigue and pain. (Tr. 188-190). In terms of fatigue, Plaintiff indicated that it began with the onset of her Fibromyalgia, had increased since it began, was worse about an hour after she took her medications, occurred daily, varied in the length of time it lasted, and was relieved by rest. (Tr. 188). In terms of pain, Plaintiff indicated that it began one (1) year prior; was constant; occurred in her wrists, hands, knees,

hips, feet, and ankles; had increased since it began; worsened with walking, sitting, and using stairs; was relieved for a few hours with medication; and was relieved by hot baths. (Tr. 189-190).

At her oral hearing on February 4, 2014, Plaintiff testified that she was unable to work due to pain from Fibromyalgia. (Tr. 69). She testified that her pain level was constantly between a five (5) and a six (6) out of ten (10), that her pain was "everywhere," and that it never went away. (Tr. 69). The medications she was taking for pain included a Fentanyl patch, Tramadol, Gabapentine, and Vicodin. (Tr. 70). The side effects from these medications included drowsiness, dizziness, and difficulty sleeping. (Tr. 70). Because of difficulty sleeping, Plaintiff testified that she napped three (3) to four (4) times a day for anywhere from one (1) to ten (10) hours at a time. (Tr. 71). She stated she would be dizzy upon standing and it would take her three (3) to five (5) minutes before sheh was able to walk, and that she was able to walk three (3) to six (6) feet before she would start shaking in her hands and legs. (Tr. 71-72). She testified that she was unable to walk on her own completely. (Tr. 72). She stated that cooking and laundry took her twice as long, and she needed help with getting dressed, stabilizing in the shower, and getting in and out of the shower. (Tr. 72). She also needed help using the stairs, and if someone was not there to help her, she would

crawl on the stairs. (Tr. 73). She testified that she also experienced symptoms such as nausea, frequent urination, easy bruising, loss of appetite, ringing in her ears, vomiting, and numbness in her hands and feet that caused an inability to pick up or open items. (Tr. 74-76). She testified that she was unable to drive and lift things because of pain and that her short-term memory was not good. (Tr. 77-78). Plaintiff also testified that she had asthma, acid reflux, and hypertension. (Tr. 77-78).

## MEDICAL RECORDS

On November 29, 2012, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to pain from Fibromyalgia. (Tr. 476). Plaintiff rated her pain at a five (5), reported it was constant and worsening, that it originated in her shoulders and radiated to her neck where the pain was aching and throbbing in nature. (Tr. 476). She reported that her pain was aggravated by lifting and movement, was not relieved by anything, and was associated with difficulty initiating sleep, joint tenderness, and nocturnal awakening. (Tr. 476). Her physical examination revealed normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with tender trigger points in her bilateral deltoids, scapula, and spine; no edema or sensory loss; an intact memory; and preserved and symmetric deep tendon reflexes. (Tr. 478). Plaintiff was

prescribed a Prednisone burst and her Neurontin dosage was increased. (Tr. 478).

On December 13, 2012, Plaintiff had an appointment with Theresa Tarquinio, PA-C for a follow-up of arthritic pain, hypertension, weight gain, and fatigue. (Tr. 472). It was noted that Plaintiff was taking Gabapentin, was on a low dose of Prednisone that did not help her pain, and that a recent ANA test was positive. (Tr. 472). Plaintiff stated that the worst pain was in her bilateral shoulders. (Tr. 472). Her physical examination revealed forced expiratory wheezing; normal range of motion muscle strength and stability in all extremities with pain with palpation of the bilateral deltoids and bilateral pectoral and trapezius muscles; no edema; and an intact memory. (Tr. 474). Plaintiff's Gabapentin dose was increased for pain and she was instructed to monitor her blood pressure at home. (Tr. 474).

On January 8, 2013, Theresa Tarquinion, PA-C opined that Plaintiff was temporarily disabled from December 1, 2012 to December 1, 2013 due to Fibromyalgia, Asthma, Hypertension, and Depression. (Tr. 315-316). Her opinion was based on physical examination. (Tr. 315).

On March 7, 2013, Plaintiff presented to the Emergency Room at Muncy Valley Hospital due to complaints of shortness of breath and wheezing. (Tr. 366). Her physical examination revealed moderate respiratory distress with accessory

muscle use and tachypnea.  (Tr. 371).  Plaintiff was diagnosed with an upper respiratory infection and an exacerbation of Chronic Obstructive Pulmonary Disease, was prescribed medications, and was discharged the same day.  (Tr. 364). Plaintiff was also advised to stop smoking.  (Tr. 364).

On May 5, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C for "a review of her chronic problems.  She has not been able to followup regularly due to no insurance."  (Tr. 467).  Her physical examination revealed a normal respiratory effort with mild wheezing; a "gingerly" gait; tenderness in the cervical, thoracic, and lumbar spine; tenderness on both sides of the spine, deltoids, anterior thighs, and buttocks; no edema; and an intact memory.  (Tr. 469).  Plaintiff was encouraged to walk even when in pain, and was instructed to quit smoking.  (Tr. 470).

On May 9, 2013, Plaintiff had a follow-up appointment with Theresa Tarquinio, PA-C.  (Tr. 463).  Plaintiff reported she would start patches for smoking cessation, that she had been doing well with her medications, that she had been walking daily, and that she was "doing better."  (Tr. 463).  Her physical examination revealed a normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with no pain on inspection; and an intact memory.  (Tr. 465).

On May 20, 2013, Plaintiff presented to the Emergency Room at Muncy Valley Hospital due to complaints of a migraine headache. (Tr. 340). A physical examination revealed no motor or sensory deficits, speech within normal limits, movement of all extremities equally, normal range of motion in the extremities, and "ambulatory to room." (Tr. 341). Plaintiff was diagnosed with sinusitis after a CT scan of her head revealed left ethmoid sinusitis, and was discharged the same day. (Tr. 339, 346, 353).

On June 10, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to complaints of wheezing, pain, and uncontrolled blood pressure. (Tr. 458). It was noted that "[o]verall appearance is chronically ill-appearing." (Tr. 460). Her physical examination revealed a normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with point tenderness on both sides of the spine, anterior and posterior chest wall, and the large muscle groups of the upper and lower bilateral extremities; no edema; preserved and symmetric deep tendon reflexes; and an intact memory. (Tr. 460). Plaintiff's Tramadol dose for Fibromyalgia and Flovent for Asthma were increased. (Tr. 460-461).

On July 9, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to complaints of increased memory loss and edema in her legs, hands, and

face. (Tr. 452). Plaintiff reported that she could not remember "anything that occurred 15 min ago. She has good recall of events that led up to edema.' (Tr. 452). Her physical examination revealed a normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with no pain on inspection; edema in her bilateral lower extremities; preserved and symmetric deep tendon reflexes; and an intact memory. (Tr. 454). Plaintiff was instructed to avoid salt in order to help the edema. (Tr. 455).

On August 20, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to complaints of insomnia and pain. (Tr. 443). She was assessed as having chronic arthralgia helped by Gabapentin. (Tr. 443). Her physical examination revealed a normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with no pain on inspection; and an intact memory. (Tr. 445). Plaintiff was assessed as having arthralgia, and was told that the Gabapentin may be causing the problems with memory that she had been having. (Tr. 446).

On September 3, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to complaints that "her memory is bad." (Tr. 438). Her physical examination revealed a mild wheeze; normal range of motion, muscle strength, and stability in all extremities with multiple trigger points tender to

palpation; no edema; intact balance and gait; intact coordination; grossly intact cranial nerves; intact memory; and grossly normal intellect. (Tr. 440). It was explained to Plaintiff that her mild amnesia was due to Neurontin, and she stated that she would rather not have her dose lowered due to her pain being under better control. (Tr. 441).

On October 23, 2013, Plaintiff had an appointment with Theresa Tarquinio, PA-C due to complaints of pain, worsened blood pressure, and depression. (Tr. 432). Her physical examination revealed a normal respiratory effort; normal range of motion, muscle strength, and stability in all extremities with no pain on inspection; and no edema in the extremities. (Tr. 435). Plaintiff was prescribed Cymbalta for pain and depression. (Tr. 435).

On November 17, 2013, Plaintiff went to the Emergency Room at Muncy Valley Hospital due to complaints of a cough and chest congestion. (Tr. 324). Her physical examination revealed tenderness in her sinuses, no motor or sensory deficits, and wheezing and rhonchi. (Tr. 329). She was diagnosed with Bronchitis, was prescribed several medications, and was discharged the same day. (Tr. 322, 326).

On December 31, 2013, Plaintiff had an appointment with Heather Letcavage, PA-C due to complaints of pain from Fibromyalgia that started "1.5

years ago and progressively got worse over time." (Tr. 410). Plaintiff reported that she had seen a Rheumatologist, who had ruled out other possible causes of her pain. (Tr. 410). Plaintiff reported her pain was sharp and stabbing, felt like spasms, was a six (6) out of ten (10) in severity, was constant, was increased by being in any position for any length of time, was decreased by a combination of medications, was associated with tingling of the hands and feet diffusely, and was not treated with physical therapy. (Tr. 410). The medications she was taking at the time of this appointment included Cymbalta, Celexa, Flovent, Gabapentin, Hydrochlorothiazide, Hydrocodone, Losartan Potassium, Metoprolol, Omeprazole, Proventil, Tramadol, and Trazadone. (Tr. 411). Her physical examination revealed bilateral medial epicondyle tendernes; tenderness to palpation of the bilateral occipital, cervical paraspinal, trapezial, lumbar paraspinal, sacroiliac, and trochanteric regions; bilateral anterior chest wall tenderness; bilateral knee medial joint line tenderness; back and severe leg pain reproduced by straight leg raise testing; and an intact gait. (Tr. 412). Her lower extremity strength was 4/5 for the following areas: iliopsoas; quadriceps; gastrocnemlus; extensor halicus longus; and tibialis anterior. (Tr. 412). Plaintiff was assessed as having Fibromyalgia, was instructed to remain active as tolerated, was examined by Shaik Ahmed, M.D., was instructed to continue with her prescriptions medications as prescribed by

Rosemary Wiegand, M.D., and was referred to physical therapy. (Tr. 413).

On January 5, 2014, Plaintiff had an appointment with Theresa Tarquinio, PA-C for chronic pain. (Tr. 502). It was noted that Plaintiff's symptoms began three (3) years prior; that her symptoms were severe and occurred constantly throughout her entire body; that aggravating factors included movement; that relieving factors included pain medications, with only minimal improvement; and that her symptoms were unstable. (Tr. 502). Her physical examination revealed an antalgic gait; tenderness in her cervical, thoracic, and lumbar spine; tenderness in her bilateral hands and knees; intact memory; a normal respiratory system; normal insight and judgment; inappropriate mood and affect; and normal deep tendon reflexes. (Tr. 505). Plaintiff was started on a Fentanyl patch and was instructed to decrease her Tramadol dosage. (Tr. 505). Theresa Tarquinio, PA-C opined that Plaintiff would be temporarily disabled from January 6, 2014 through January 6, 2015 due to Fibromyalgia, Depression, and Anxiety based on physical examinations of Plaintiff, a review of medical records, the clinical history, and the appropriate tests and diagnostic procedures. (Tr. 511).

On January 13, 2014, Plaintiff had an appointment with Theresa Tarquinio, PA-C. It was noted that Plaintiff's symptoms began three (3) years prior; that her symptoms were severe and occurred constantly throughout her entire body; that

aggravating factors included movement, pressure, and weather changes; that relieving factors included pain medications, with only minimal improvement; and that moving caused her pain. (Tr. 497). Her physical examination revealed a normal respiratory system; left knee tenderness; appropriate mood and affect; normal insight and judgment; normal memory; and no edema. (Tr. 500). Plaintiff's Fentanyl patch dosage was increased. (Tr. 500).

On February 3, 2014, Plaintiff had an appointment with Theresa Tarquinio, PA-C for follow-up of her chronic pain. (Tr. 514). Plaintiff noted that her pain had been increasing in her limbs and muscles to the point where she could not walk more than a few feet without assistance. (Tr. 514). Plaintiff reported that she had been unable to care for herself and had help from her significant other to bathe and dress herself daily. (Tr. 514). She also stated that the Gabapentin had not been working anymore, and that she had been requiring more and more short-acting pain medications to control the pain. (Tr. 514). She reported that the Fentanyl patch was helping her a bit more, but that she still could not function well. (Tr. 514). Her physical examination revealed coarse breath sounds; a normal respiratory effort; no edema; tenderness on palpation of the paraspinous muscles, pectoral muscles, bilateral deltoids, anterior forearm, anterior thighs, medial knees, and elbows; and normal memory, insight, and judgment. (Tr. 517).

It was noted that Plaintiff's Fibromyalgia seemed to be getting progressively

worse.  (Tr. 517).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

**ALJ DECISION**

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2016.  (Tr. 20).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from his alleged onset date of October 12, 2012.

(Tr. 20).

At step two, the ALJ determined that Plaintiff suffered from the severe[8]

---

8.  An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,

combination of impairments of the following: "fibromyalgia, hypertension, asthma, gastroesophageal reflux, obesity, and depression (20 C.F.R. 404.1520( c) and 416.920 ( c))."  (Tr. 20-21).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 21-23).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations.  (Tr. 23-28).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except sheh can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold and heat, wetness/ humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as heights and moving machinery.  In addition, [Plaintiff] is able to understand,

---

sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

remember and carry out simple instructions.

(Tr. 23).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 28-29).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between October 12, 2012, the alleged onset date, and the date of the ALJ's decision. (Tr. 29).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erred in determining that her Fibromyalgia did not meet Impairment Listing 14.09D; (2) in determining Plaintiff's RFC; and (3) in determining Plaintiff's credibility. (Doc. 12, pp. 6-21). Defendant disputes these contentions. (Doc. 13, pp. 12-26).

### 1. RFC Determination

Plaintiff asserts that the ALJ erred in determining her RFC because the ALJ relied on lay reinterpretation of medical evidence, rather than a medical opinion, to formulate her RFC. (Doc. 12, pp. 11-13, 18-19).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge

may only assign less weight to a treating source opinion based on a non-treating,

non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996

SSR LEXIS 3. This regulation does not define "appropriate circumstances," but

gives an example that "appropriate circumstances" exist when a non-treating, non-

examining source had a chance to review "a complete case record . . . which

provides more detailed and comprehensive information than what was available to

the individual's treating source." Id. (emphasis added).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative law judge cannot speculate as to a claimant's residual functional capacity, but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination. Doak, 790 F.2d at 29 ; see Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the ALJ's ultimate determination. The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) ("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there

was no contrary treating source opinion.  Id.  '[D]ictum, unlike holding, does not

have strength of a decision 'forged from actual experience by the hammer and

anvil of litigation.' . . . the only precedential holding in Chandler is the

unremarkable finding that an ALJ may rely on a state agency medical opinion that

the claimant is not disabled when there are no medical opinions from treating

sources that the claimant is disabled.  See Chandler, 667 F.3d at 361-63. . . .

Consequently, with regard to lay reinterpretation of medical evidence,

Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi, Fowler and Gober

continue to bind district Courts in the Third Circuit."); Maellaro v. Colvin, 2014

U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The

ALJ's decision to reject the opinions of Maellaro's treating physicians created a

further issue; the ALJ was forced to reach a residual functional capacity

determination without the benefit of any medical opinion.  Rarely can a decision

be made regarding a claimant's residual functional capacity without an assessment

from a physician regarding the functional abilities of the claimant. *See Doak v.

Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity

[the claimant] could perform was consistent with the definition of light work set

forth in the regulations, and therefore the ALJ's conclusion that he could is not

supported by substantial evidence.").  *See also Arnold v. Colvin*, 3:12-CV-02417,

2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014);

*Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL

791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012

U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

The ALJ's decision to discredit, at least partially, every residual functional

capacity assessment proffered by medical experts left her without a single medical

opinion to rely upon. For example, three physicians opined that Maellaro was

limited in some way in his ability to stand and/or walk: Dr. Dittman opined that

Maellaro could stand/walk for less than one hour, Dr. Singh believed that

Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that

Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In

rejecting these three opinions, there were no other medical opinions upon which

the ALJ could base her decision that Maellaro essentially had no limitations in his

ability to stand or walk.  Tr. 283. Consequently, the ALJ's decision to reject the

opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's

residual functional capacity, cannot be said to be supported by substantial

evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D.Pa.

February 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the

Commissioner that his administrative law judges can set the residual function

capacity in the absence of medical opinion or evidence must be rejected in light of Doak. Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is *dicta* and must be disregarded. Government of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011)(a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39 (M.D.Pa. January 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No. 10-1265, slip op. at 38-39 (M.D.Pa. September 27, 2011) (Caputo, J.) (Doc. 17).

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. The ALJ gave limited weight to the opinions rendered by Theresa Tarquinio, PA-C that Plaintiff was temporarily disabled due to Fibromyalgia because "they are not supported by examination findings or any objective diagnostic evidence." (Tr. 27). This Court cannot ascertain from the analysis conducted by the ALJ how that decision-maker was able to determine a residual functional capacity regarding any limitations Plaintiff may have. Furthermore, the very definition of "light work" found in 20 C.F.R. § 416.967(b) makes it all the more important that this case be remanded, for this regulation is as follows:

> Light work involves lifting no more than 20 pounds at a time

30

with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The fact that the ALJ did not give weight to any opinion involving any functional limitations whatsoever, but rather instead reinterpreted the medical evidence in arriving at her RFC determination, goes to support the conclusion that the ALJ's RFC determination is not supported by substantial evidence. See Snyder, 2017 U.S. Dist. LEXIS 41109 at *13-14 (Brann, J.) ("The ALJ failed to point to any specific medical evidence that would support a contrary opinion on Snyder's standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion. Accordingly, the ALJ's conclusion is not supported by substantial evidence."). Therefore, pursuant to 42 U.S.C. § 405(g), remand is warranted, and this Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598

(M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011

U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14,

2011).

**CONCLUSION**

      Based upon a thorough review of the evidence of record, it is determined

that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner of the Social Security Administration.

      A separate Order will be issued.


**Date**: August 29, 2017


                                         **/s/ William J. Nealon**
                                         **United States District Judge**